**APOLLO SPRINKLER COMPANY, INC., Plaintiff and Appellant,**

v.

**FIRE SPRINKLER SUPPLIERS & DESIGN, INC., Defendant,**

and

**Mutual Service Casualty Insurance Company, Garnishee and Appellee.**

**Civ. No. 10971.**

Supreme Court of North Dakota.

Feb. 20, 1986.

Duane A. Lillehaug, of Dosland, Dosland & Nordhougen, Moorhead, Minn., for plaintiff and appellant.

Timothy J. McLarnan, of Gjevre, McLarnan, Hannaher, Vaa, Skatvold & McLarnan, Moorhead, Minn., for garnishee and appellee.

VANDE WALLE, Justice.

Apollo Sprinkler Co., Inc. (Apollo), appealed from a district court judgment in a garnishment proceeding in which Apollo asserted the right of Fire Sprinkler Suppliers & Design, Inc. (Fire Sprinkler), to benefits under an insurance policy issued by Mutual Service Casualty Insurance Co. (MSI). Apollo also appealed from an order denying its motions for amendment of the findings of fact, conclusions of law, and judgment. The dispositive issue on appeal is whether or not the trial court properly applied Minnesota, rather than North Dakota, law in construing the insurance policy. Although both states have contacts with the policy, we conclude that Minnesota law was properly applied, and we affirm.

Apollo is engaged in the business of designing and installing fire-protection sprinkler systems in buildings. Fire Sprinkler is a wholesaler of component parts of fire-sprinkler systems.

Because of Fire Sprinkler's representations that Apollo could substitute plastic escutcheons (decorative devices for fire sprinklers) for the metal ones it had been purchasing from Fire Sprinkler, Apollo purchased 12,000 plastic escutcheons from Fire Sprinkler and placed them in its Fargo warehouse. Apollo installed 4,000 of the plastic escutcheons in Minnesota buildings. When Apollo later learned that the plastic escutcheons were not suitable substitutes for metal ones, it replaced at a cost of $59,672.82 the escutcheons it had installed in Minnesota.

Apollo sued Fire Sprinkler for damages in district court. Fire Sprinkler tendered defense of the action to its insurer, MSI, which denied coverage and refused to defend. The action was removed to Federal court. Apollo and Fire Sprinkler entered into a stipulation and confession of judgment stating in part:

"6. It is evident to the defendants that if this case is tried, the defendant Fire Sprinkler Suppliers & Design will be adjudged to have breached express and implied warranties of merchantable quality, freedom from defects, and fitness for purpose sold and that damages will be awarded to the plaintiff in the amount demanded.

\*　　\*　　\*　　\*　　\*　　\*

"That the defendant Fire Sprinkler Suppliers & Design does confess judgment in favor of the plaintiff in the amount of $59,672.82 upon the condition that plaintiff agrees that the judgment may be satisfied only from liability insurance policies issued to such defendant and applicable by their terms to the damages complained of, ..."

Judgment was entered accordingly.

Apollo then commenced a garnishment proceeding against MSI in North Dakota district court. The evidence at trial was submitted to the court by stipulation. Among other things, the parties stipulated: (1) "That MSI is a Minnesota corporation headquartered in Minnesota and authorized to do business in and doing business in North Dakota;" and (2) "That the policies which were issued to Fire Sprinkler by MSI were issued in Minnesota as a result of negotiations between the insured and MSI

in Minnesota; that the premiums were paid by Fire Sprinkler to MSI in Minnesota."

The trial court determined that the Minnesota contacts were more significant than the North Dakota contacts, applied Minnesota law in construing the insurance policy, and ordered dismissal of Apollo's complaint. Judgment was entered accordingly. The trial court denied Apollo's motions to amend the court's findings, conclusions, and order for judgment.

Underlying the issue of whether Minnesota or North Dakota law applies is the construction of the liability policy involved. The policy provides coverage for bodily injury and property damage caused by an occurrence, and defines those terms. Under "Exclusions," the policy provides:

"This insurance does not apply:

"(a) to liability assumed by the insured under any contract or agreement except an incidental contract; *but this exclusion does not apply to a warranty of fitness or quality of the named insured's products or a warranty that work performed by or on behalf of the named insured will be done in a workmanlike manner;* [Emphasis added.]

\* \* \* \* \* \*

"(n) to property damage to the named insured's products arising out of such products or any part of such products;

"(o) to property damage to work performed by or on behalf of the named insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith;

"(p) to damages claimed for the withdrawal, inspection, repair, replacement, or loss of use of the named insured's products or work completed by or for the named insured or of any property of which such products

or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein; ..."

We have held that the italicized exception to exclusion (a) operates as a grant of coverage for breach of warranty [*Emcasco Ins. Co. v. L & M Development, Inc.,* 372 N.W.2d 908 (N.D.1985);[1] *Aid Ins. Services, Inc. v. Geiger,* 294 N.W.2d 411 (N.D.1980); *Applegren v. Milbank Mutual Ins. Co.,* 268 N.W.2d 114 (N.D.1978) ], that is not overcome by exclusion (*o*) [*Emcasco, supra,* and *Geiger, supra* ], and that a builder's breach of warranty was covered by liability insurance policies [*Emcasco, supra,* and *Geiger, supra* ]. We have not yet had occasion to determine whether exclusions (n) or (p) are sufficient to overcome the coverage granted in the exception to exclusion (a). The Minnesota Supreme Court, on the other hand, has held that "an exception to an exclusion should only indicate that the exception is a grant of coverage if the policy as a whole is ambiguous" [*Moorhead Mach. & Boiler Co. v. Employers Commercial Union Ins. Co.,* 285 N.W.2d 465, 468 (Minn.1979) ], and that an insured building contractor's faulty workmanship "is not within the coverage of the contractor's general liability policy." *Bor-Son Building Corp. v. Employers Commercial Union Ins. Co.,* 323 N.W.2d 58, 63 (Minn.1982). The foregoing cases also demonstrate that the factors our two courts rely on in determining whether or not an insurance policy is ambiguous are different.

In *Issendorf v. Olson,* 194 N.W.2d 750 (N.D.1972), we relied on *Babcock v. Jackson,* 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279, 95 A.L.R.2d 1 (1963), to abandon the *lex loci delicti* doctrine and to adopt the "significant contacts" approach to deciding choice-of-law questions in tort

---

1. We also noted in *Emcasco,* 372 N.W.2d at 911, that the result would be the same if we construed the exception to exclusion (a) as:

"excepting breach of warranty from the application of the exclusion for contractual liability, thereby leaving breach of warranty within the coverage grant, which is 'broad enough to include the insured's obligation to pay damages for breach of contract as well as for tort,' ..." [Citation omitted.]

cases with multistate factual contacts. We abandoned the *lex loci delicti* doctrine because the theory ignores the interest which jurisdictions other than that where the tort occurred may have in the resolution of particular issues. We adopted the significant-contacts approach because:

> " 'Justice, fairness and "the best practical result" (*Swift & Co. v. Bankers Trust Co.*, 280 N.Y. 135, 141, 19 N.E.2d 992, 995, supra) may best be achieved by giving controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties has the greatest concern with the specific issue raised in the litigation. The merit of such a rule is that "it gives to the place 'having the most interest in the problem' paramount control over the legal issues arising out of a particular factual context" and thereby allows the forum to apply "the policy of the jurisdiction 'most intimately concerned with the outcome of [the] particular litigation'." (*Auten v. Auten*, 308 N.Y. 155, 161, 124 N.E.2d 99, 102, supra.)' *Babcock v. Jackson, supra* [12 N.Y.2d 473], 240 N.Y.S.2d 743, 749, 191 N.E.2d 279, 283." *Issendorf, supra*, 194 N.W.2d at 754.

As an aid in deciding which jurisdiction has the more significant interest with reference to a particular issue, we quoted with approval R. Leflar, *Choice-Influencing Considerations in Conflicts Law*, 41 N.Y. U.L.Rev. 267, 282 (1966):

> "A. Predictability of results;
>
> "B. Maintenance of interstate and international order;
>
> "C. Simplification of the judicial task;
>
> "D. Advancement of the forum's governmental interests;

> "E. Application of the better rule of law."

Although we adopted the significant-contacts rule in *Issendorf* and applied it in *Mager v. Mager*, 197 N.W.2d 626 (N.D. 1972), another tort case, we have not determined whether the rule is applicable in contract cases.[2] Because both parties to this appeal agree that the *Issendorf* approach is appropriate, we shall use it, without deciding whether it is necessary or appropriate in future contract cases.

Apollo asserts that "the trial court incorrectly applied the modern rule, and fell into the trap of merely counting contacts." We do not agree. The trial court recited more Minnesota contacts than North Dakota contacts in its findings of fact and conclusions of law. The court did, however, determine that "[t]he contacts with Minnesota are more significant than the contacts with North Dakota." We believe that was a recognition that, apart from their number, the Minnesota contacts with the underlying issue were more significant than the North Dakota contacts.

North Dakota's factual contacts are: (1) Apollo is a North Dakota corporation with offices in North Dakota; (2) Apollo received the warranty in a telephone conversation which occurred in North Dakota; (3) Apollo placed the escutcheons in its warehouse inventory in North Dakota; (4) MSI is licensed to do, and does, business in North Dakota; and (5) Apollo brought suit in North Dakota.

Minnesota's factual contacts are: (1) Fire Sprinkler is a Minnesota corporation with offices in Minnesota; (2) the escutcheons were installed in Minnesota buildings; (3) MSI is a Minnesota corporation headquartered in Minnesota; (4) MSI issued the in-

---

**2.** Section 9–07–11, N.D.C.C., repealed by 1973 N.D.Sess.Laws, Ch. 77, provided that a contract is to be interpreted according to the law and usage of the place where it is to be performed, or if it does not indicate a place of performance, according to the law and usage of the place where it is made. Minutes of the Judiciary Committees of the House and Senate which considered H.B. 1105, repealing the statute, indicate an intent that the flexibility allowed the

courts in determining what law governs in tort actions should also apply in contract matters. The repeal of Section 9–07–11 was apparently in response to the decision of this court in *First National Bank of Wibaux v. Dreher*, 202 N.W.2d 670 (N.D.1972), applying the statute in determining whether the North Dakota or Montana usury statute controlled a note payable to the bank in Montana.

surance policy to Fire Sprinkler in Minnesota; (5) the negotiations between Fire Sprinkler and MSI occurred in Minnesota; and (6) the insurance premiums were paid by Fire Sprinkler to MSI in Minnesota.

The significance of the North Dakota contacts is somewhat diminished because we are not dealing with Fire Sprinkler's breach of warranty, but with whether or not Fire Sprinkler's liability insurance policy with MSI affords coverage for breach of warranty. Apollo has conceded that "[i]n assessing the interests to be protected, . . . the court must look at the interests of Fire Sprinkler, because Apollo stands in the shoes of Fire Sprinkler." In light of the foregoing, we believe the most significant contacts are those bearing upon the contractual relationship between Fire Sprinkler and MSI,[3] and we examine those contacts in light of the "choice-influencing considerations":

### A. Predictability of results

"Predictability and uniformity of result are of particular importance in areas where the parties are likely to give advance thought to the legal consequences of their transactions." *Restatement (Second) of Conflict of Laws* § 6, comment i (1971). A liability insurance contract is a consentual transaction to which the parties are likely to have given advance thought. This is especially true of insurance companies, whose policies are "drafted by company experts learned in the law of insurance." *Geiger, supra,* 294 N.W.2d at 414. Parties to a contract "should be able to plan their transaction as one with predictable results." R. Leflar, 41 N.Y.U.L.Rev. 267,

283 (1966). In negotiating the contract of insurance at issue, Fire Sprinkler and MSI are more likely to have thought that the coverage afforded would be determined in accordance with the law of Minnesota, where the parties resided, the contract was negotiated, the policy was issued, and the premiums were paid, than in accordance with the law of any other State.

### B. Maintenance of interstate and international order

"Choice-of-law rules . . . should seek to further harmonious relations between states and to facilitate commercial intercourse between them." *Restatement (Second) of Conflict of Laws* § 6, comment d (1971). A state's application of its law to a transaction whose significant contacts are primarily with another state may induce retaliation in kind, which would not further harmonious relations and commercial intercourse. Choice-of-law rules should avoid such interstate friction. See R. Leflar, 41 N.Y.U.L.Rev. 267, 287.

### C. Simplification of the judicial task

While North Dakota and Minnesota courts treat the relationship between an exception to an exclusion of coverage in an insurance policy and other coverage exclusions in the policy differently, we see no particular difficulty in applying either state's rules for construing insurance policies.

### D. Advancement of the forum's governmental interests

"In general, it is fitting that the state whose interests are most deeply affected should have its local law applied." *Re-*

---

**3.** See *Restatement (Second) of Conflict of Laws* § 188 (1971), which states in part:

"(1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.

"(2) . . . the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

"(a) the place of contracting,

"(b) the place of negotiation of the contract,

"(c) the place of performance,

"(d) the location of the subject matter of the contract, and

"(e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

"These contacts are to be evaluated according to their relative importance with respect to the particular issue. . . ."

*Restatement (Second) of Conflict of Laws* § 6 (1971) sets forth seven "factors relevant to the choice of the applicable rule of law," all of which are subsumed in Leflar's "choice-influencing considerations."

*statement (Second) of Conflict of Laws* § 6, comment f (1971). North Dakota can have no substantial governmental interest in regulating the relationship between a Minnesota insurance company and its Minnesota insured or in construing the contractual agreement between them in accordance with North Dakota law when the Minnesota contacts are much more significant than the North Dakota contacts.[4]

### E. Application of the better rule of law

While we believe that our rules for construing the effect of an exception to an exclusion of coverage in relation to other coverage exclusions in an insurance policy constitute the better rule of law, we recognize that ours is a "minority position." See *Emcasco Ins. Co. v. L & M Development, Inc., supra,* 372 N.W.2d at 911. Our belief that ours is the better rule of law, however, is insufficient under the circumstances presented in this case to override other relevant considerations militating in favor of the application of Minnesota law in the construction of the insurance policy at issue.

In light of the foregoing, North Dakota's contacts bearing upon the contractual relationship between Fire Sprinkler and MSI are "few and relatively insignificant as compared with those of" Minnesota, and this presents "an easy conflicts case." R. Leflar, 41 N.Y.U.L.Rev. 267, 289–90. We conclude that Minnesota is the State with the most significant contacts with the insurance policy at issue. We therefore conclude that the trial court did not err in applying Minnesota law in the construction of the insurance policy. Because Apollo conceded at oral argument that it cannot win unless North Dakota law is applied, discussion of other issues is unnecessary.

The judgment and order are affirmed.

ERICKSTAD, C.J., and LEVINE, MESCHKE and GIERKE, JJ., concur.

4. Apollo's plea to apply North Dakota law appears to be based principally on the premise that we should protect North Dakota persons or entities whenever North Dakota has any contacts with a controversy. That kind of "chauvinistic parochialism" [R. Leflar, *The Nature of Conflicts Law,* 81 Col.L.Rev. 1080 (1981) ], however, is one of the evils sought to be avoided by modern choice-of-law analysis.