1998 ND 225

Ryan DALEY, Plaintiff,

v.

AMERICAN STATES PREFERRED INSURANCE COMPANY,
Defendant and Appellant,

and

Nodak Mutual Insurance Co.,
Defendant and Appellee.

Civil No. 980171

Supreme Court of North Dakota.

Dec. 22, 1998.

Steven L. Marquart of Cahill & Marquart, Moorhead, MN, for defendant and appellant.

Ronald J. Knoll (argued) of Jeffries, Olson, Flom & Bullis, P.A., Moorhead, MN, Paul E. Traynor, General Counsel, Nodak Mutual Insurance Co., for defendant and appellee.

MARING, Justice.

[¶ 1] American States Preferred Insurance Company (American States) appeals from the district court's summary judgment in favor of Nodak Mutual Insurance Company (Nodak). The district court, applying Minnesota law, determined American States must pay Ryan Daley's no-fault insurance benefits and indemnify Nodak for $12,786.10 in no-fault benefits Nodak had provided to Daley. We conclude North Dakota law should have been applied, and we reverse.

I

[¶ 2] On May 11, 1996, Ryan Daley and Nathan Schaffer, both residents of Fargo, North Dakota, were involved in a single vehicle car accident in Minnesota. Daley, a passenger in Schaffer's vehicle, was injured. At the time of the accident, two insurance policies covered Daley for basic no-fault benefits. Daley was insured for basic personal injury protection under a policy issued by American States to his mother, Kitty Kinslow, of Fargo, North Dakota. Daley was also insured for basic no-fault personal injury protection through a policy issued by Nodak to Schaffer covering the vehicle involved in the accident.

[¶ 3] Prior to initiating this lawsuit, Daley applied for and received $5,000 in no-fault benefits from Nodak. After paying $5,000 in medical expenses, Nodak sought to coordinate benefits with Daley's health insurance carrier under N.D.C.C. § 26.1–41–13(3). On June 24, 1997, Daley sued American States and Nodak claiming he was entitled to no-fault benefits for his remaining unpaid medical bills. Neither company denied Daley was entitled to coverage under their policies. Rather, the dispute focused on whether Minnesota or North Dakota law applied and which company was obligated to pay Daley's no-fault benefits. Subsequent to the commencement of Daley's lawsuit, Nodak and American States brought cross motions for summary judgment.

[¶ 4] On March 5, 1998, the district court heard the cross motions and granted summary judgment in favor of Nodak. The district court determined Minn.Stat. § 65B.47, subd. 4 applied to resolve the dispute between Nodak and American States. Based on that determination, the court concluded American States had first priority to pay Daley's no-fault benefits, and ordered American States to fully indemnify Nodak for $12,786.10 in no-fault benefits it had provided to Daley. American States timely appealed.

II.

[¶ 5] The determination of which company is responsible to pay no-fault benefits turns on a choice of laws issue; namely, whether North Dakota or Minnesota law applies. Under Minnesota's no-fault law, Minn.Stat. § 65B.47, subd. 4(a), "[t]he security for payment of basic economic loss benefits applicable to injury to an insured is the security under which the injured person is an insured." Thus, under Minnesota law, American States, as Daley's insurer, is required to compensate Daley for his no-fault benefits. On the other hand, under North Dakota's no-fault law, N.D.C.C. § 26.1–41–13(2)(a), "the basic no-fault insurer of the secured motor vehicle shall pay the benefits." Thus, under North Dakota law, Nodak, as the insurer of Schaffer's vehicle, is required to compensate Daley for his no-fault benefits.

[¶ 6] The issue below, as it was framed by the district court and both parties, was whether the facts in this case called for application of this Court's choice of law anal-

ysis in *American Family Mut. Ins. Co. v. Farmers Ins. Exch.*, 504 N.W.2d 307 (N.D. 1993) or the "significant contacts" approach which we applied in *Vigen Constr. Co. v. Millers Nat'l Ins. Co.*, 436 N.W.2d 254 (N.D. 1989) and *Apollo Sprinkler Co. v. Fire Sprinkler Suppliers & Design, Inc.*, 382 N.W.2d 386 (N.D.1986). Because the issue framed as such erroneously assumes *American Family* signaled a break from this Court's traditional "significant contacts" approach to choice of law analysis, we take this opportunity to review our approach to choice of law issues, and clarify the *American Family* decision.

### A

[¶ 7] The "vested rights" approach to choice of law issues dominated American choice of law analysis during the first half of this century. Under the vested rights approach, the location of some single significant factor in a transaction identified the jurisdiction whose law would be applied. Professor Joseph Beale developed this theory most fully, both as the reporter of the *Restatement of Conflict of Laws* (1934) and in his own treatise, Joseph Beale, *The Conflict of Laws* (1935). *See generally* Robert A. Leflar, et al., *American Conflicts Law*, § 86, at 255 (4th ed.1986).

[¶ 8] In 1957, our Court in *Pearson v. Erb*, 82 N.W.2d 818, 821–22, adopted the vested rights approach. The *Pearson* Court held choice of law issues in tort cases were to be " 'determined by the law of the place where the act or omission claimed to be the cause of the damage took place.' " *Id.* at 822 (quoting 2 Beale, *supra*, § 379.1).

[¶ 9] By the late 1950's, however, many courts were becoming frustrated with the fixed and mechanical rule of vested rights. This dissatisfaction "resulted in a number of new suggestions and counter-suggestions, a 'revolution' in American conflicts law." Eugene F. Scoles & Peter Hay, *Conflict of Laws*, § 2.6, at 15 (2nd ed.1992).

[¶ 10] In 1972, our Court in *Issendorf v. Olson*, 194 N.W.2d 750, 756, abandoned the vested rights doctrine and adopted one of the "new suggestions" to deciding choice of law issues, the "significant contacts" test. The *Issendorf* Court adopted the "significant contacts" test as it was applied by the New York Court of Appeals in the landmark tort case *Babcock v. Jackson*, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (N.Y.1963). In explaining the rationale underlying the significant contacts test, we quoted the following passage from *Babcock:*

> Justice, fairness and the best practical result may best be achieved by giving controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties[,] has the greatest concern with the specific issue raised in the litigation. The merit of such a rule is that it gives to the place having the most interest in the problem paramount control over the legal issues arising out of a particular factual context and thereby allows the forum to apply the policy of the jurisdiction most intimately concerned with the outcome of [the] particular litigation.

*Issendorf*, 194 N.W.2d at 754 (quoting *Babcock*, 240 N.Y.S.2d 743, 191 N.E.2d at 283 (citations and quotation marks omitted)). At its core, the significant contacts test authorizes a court "to look at all of the significant factors which might logically influence it in deciding which law to apply, and to choose the law of the state that has the greatest contacts with the case." Gregory E. Smith, *Choice of Law in the United States*, 38 Hastings L.J. 1041, 1047 (1987) (discussing the center of gravity or significant contacts test); *cf. Issendorf*, 194 N.W.2d at 755.

[¶ 11] Standing alone, however, the significant contacts test, as it was applied in *Babcock*, did not provide courts with any standards to consider when examining or determining the significance of the relevant contacts.[1] In step with the Supreme

---

1. The Rhode Island Supreme Court recognized this limitation to the significant contacts test in *Woodward v. Stewart*, 104 R.I. 290, 243 A.2d 917, 923 (1968). *See id.* (stating that "[m]erely abandoning the *lex loci delicti* rule and adopting the new [significant contacts] approach ... will not serve as a guide for the bench and bar, unless some standards are set forth by which cases may be decided consistently"). In *Issendorf*, we quoted the *Woodward* court extensively in support of our decision to adopt the significant contacts test. *See Issendorf*, 194 N.W.2d at 754–755.

Courts of Rhode Island, Wisconsin, and New Hampshire, we found merit in the guidelines suggested by Dean Leflar. *See Issendorf*, 194 N.W.2d at 754–55. Leflar's "choice-influencing" factors are:

A. Predictability of results;

B. Maintenance of interstate and international order;

C. Simplification of the judicial task;

D. Advancement of the forum's governmental interests;

E. Application of the better rule of law.

*See id.* at 755, (quoting Robert A. Leflar, *Choice–Influencing Considerations in Conflicts Law*, 41 N.Y.U. L.Rev. 267, 282 (1966)).

[¶ 12] With the adoption of the Leflar choice-influencing factors our significant contacts test became something of a hybrid, and effectively became a two-pronged analysis. Initially, we determine all of the relevant contacts which might logically influence the decision of which law to apply. *Issendorf*, 194 N.W.2d at 755; Smith, *supra*, at 1046–47. Then we apply Leflar's five choice-influencing factors to determine which jurisdiction has the more significant interest with the issues in the case. *Issendorf*, 194 N.W.2d at 754–55.

[¶ 13] In the mid–1980's, we began applying our significant contacts test to choice of law issues in contracts cases.[2] In *Apollo Sprinkler*, 382 N.W.2d at 387, we addressed the issue of whether North Dakota or Minnesota law governed the terms of the defendant's insurance policy. In so doing, we noted the adoption of the significant contacts approach in *Issendorf* and then enumerated Leflar's five choice-influencing factors. *Id.* at 388–89. In our consideration of the Leflar factors, specifically, the first, second, and fourth, we referenced the Restatement (Second) of Conflict of Laws (Second Restatement). *Id.* at 390–91. We now examine our rationale for doing so.

[¶ 14] Under the Second Restatement approach to choice of law, the choice of jurisdiction is to be made in terms of the state having the "most significant relationship" to the parties and issues involved. Initially, under this approach, specific contacts with the jurisdictions, which are listed in various sections of the Second Restatement, are to be considered.[3] Then the specific contacts are to be measured by reference to the list of seven policy principles outlined in section 6.[4]

[¶ 15] Our significant contacts method of analysis mirrors the Second Restatement's. Under our analysis, we first determine "significant contacts" by looking at all of the relevant contacts which might logically influence the decision of which law to apply. Under the Second Restatement, depending on whether the case is in contract or tort, the analysis begins with examination of the relevant contact points listed in sections 145 or 188. In our second step, we apply Leflar's five choice-influencing factors to the relevant contacts to determine which jurisdiction has the more significant interest with reference

---

2. We applied the significant contacts test in two insurance contract cases in the 1980's, however, because the parties in each case had stipulated to its application, we did not squarely decide whether to adopt that approach in contract cases. *See Vigen Constr. Co. v. Millers Nat'l Ins. Co.*, 436 N.W.2d 254 (N.D.1989); *Apollo Sprinkler Co. v. Fire Sprinkler Suppliers & Design, Inc.*, 382 N.W.2d 386 (N.D.1986). In *Plante v. Columbia Paints*, 494 N.W.2d 140, 141 (N.D.1992), however, we did specifically adopt the significant contacts approach in contract cases.

3. For instance, the specific contacts to be considered in tort cases are: the place where the injury occurred; the place where the conduct causing the injury occurred; the domicile, nationality, residence, place of business, or place of incorporation of the parties; and the place where the relationship, if any, between the parties is centered. *See* Restatement (Second) of Conflict of

Laws, § 145(2)(a)-(d) (1971). For contract cases, the specific contacts include: the place of negotiation, formation or performance of the contract, the place where the object of the contract is located, and again, the parties' domicile, nationality, residence, place of business or incorporation. *See id.* § 188(2)(a)-(e).

4. The Second Restatement's seven choice of law policy principles are: the needs of the interstate and international systems; the relevant policies of the forum; the relevant policies of other interested states and the relative interest of those states in the determination of the particular issue; the protection of the justified expectations; the basic policies underlying the particular field of law; certainty, predictability and uniformity of result; and ease in the determination and application of the law to be applied. *See* Restatement (Second) of Conflict of Laws, § 6(2)(a)-(g) (1971).

to a particular issue. Under the Second Restatement, the significance of the contact points in sections 145 or 188 is to be measured by reference to the seven policy principles listed in section 6.

[¶ 16] The respective tests, though distinct, tend to express some of the same principles. Indeed, "[t]he seven 'factors' listed in § 6 cover the same ground as the first four of [Leflar's] choice-influencing considerations ... so that only the fifth of the considerations, preference for a better rule of law, is not specifically set out." Leflar, *supra*, § 109, at 303; *see also Apollo,* 382 N.W.2d at 390 n. 3.

[¶ 17] Our reference in *Apollo* to the commentary to section 6 during our analysis of the Leflar factors was merely an attempt to further define the contours of those factors. The reference to the Second Restatement did not signal an intent to forge a "new" choice of law approach or express dissatisfaction with our current approach. Our significant contacts test remains the same as when it was first enunciated in *Issendorf.*[5]

## B

[¶ 18] Nodak relies on *American Family Mut. Ins. Co. v. Farmers Ins. Exch.,* 504 N.W.2d 307 (N.D.1993), to support its argument that a significant contacts analysis is unnecessary to determine which states' law applies in this case. In *American Family,* Nodak argues, this Court adopted a "strong territorial approach" to choice of law issues in cases involving subrogation claims between two no-fault insurers. American States, on the other hand, does not dispute Nodak's characterization of *American Family;* rather, it argues *American Family* is distinguishable on its facts. Both parties are wrong in assuming *American Family* signaled a departure by our Court from the significant contacts approach to choice of law issues. *See Starry v. Cent. Dakota Printing, Inc.,* 530 N.W.2d 323, 325–26 (N.D.1995) (dis-

cussing *American Family* and applying our significant contacts analysis).

[¶ 19] In *American Family,* a North Dakota resident, driving a vehicle licensed in North Dakota, and insured by a policy issued in North Dakota, collided with a Minnesota resident, driving a vehicle licensed in Minnesota, and insured by a policy issued in Minnesota. 504 N.W.2d at 307–08. The insurer of the North Dakota driver paid him no-fault benefits for his injuries and sued the insurer of the Minnesota driver, seeking a declaratory judgment that it was entitled to subrogation under the North Dakota no-fault equitable allocation statute. *Id.* at 308. Due to the almost symmetrical relationship of the relevant significant contacts, we found the usual application of our significant contacts test to be of little help in resolving the choice of law issue. *Id.* at 308–09. The unique factual circumstances in the case effectively "balance[d] out" all of the relevant contacts because any contacts cited by one insurer could be raised "in mirror-image fashion" by the other. *Id.* at 309.

[¶ 20] In turning to the second step of our significant contacts analysis, we decided it was unnecessary to address each of the Leflar factors at length because there was one overridingly significant factor for us to consider. *American Family,* 504 N.W.2d at 309. Looking to *Issendorf* and reiterating the rationale underlying our significant contacts approach, we found that factor to be "the law of the jurisdiction whose 'interests are more deeply affected by the issues raised.'" *Id.* (citation omitted). Noting the strong territorial nature of the no-fault laws in both states, we concluded:

> The statutory schemes of North Dakota and Minnesota, as well as the Uniform [Motor Vehicle Accident Reparations] Act, demonstrate a singular concern with coverage for accidents occurring within the boundaries of that state. Each provides

5. In *Apollo,* we also referenced section 188 of the Second Restatement in our discussion of the "significant contacts" which had bearing on the contractual relationship between the parties. 382 N.W.2d at 390 n. 3. We looked to the contacts listed in section 188 for guidance, even though our significant contacts approach allows

us to take into consideration any relevant contact which might logically influence the decision of which law to apply. Again, our consideration of the contacts listed in section 188 of the Second Restatement did not evince an intent to adopt or create a new approach to choice of law issues.

for mandatory coverage when an out-of-state vehicle is driven within the state. The legislatures of North Dakota and Minnesota have recognized that benefits under the Minnesota statute are available when a North Dakota insured is injured in a Minnesota accident. Minnesota no-fault law should apply to determine the availability of subrogation when Minnesota no-fault law governs the benefits available to the insured and Minnesota tort law governs the underlying action.

*Id.* at 310–311. Thus, since the accident occurred in Minnesota, and Minnesota had "the *more significant contacts* with the issue of statutory subrogation for no-fault benefits under the facts of [the] case," Minnesota no-fault law applied. *Id.* at 311 (emphasis added).

[¶ 21] Contrary to Nodak's assertion at oral argument, *American Family* did not signal a retreat from our "significant contacts" approach to choice of law issues, nor did it carve out an exception to that approach in statutory subrogation no-fault insurance cases. We, in fact, applied our significant contacts test in *American Family*. Because of the unique factual posture of the case, however, all of the relevant contacts balanced out, as did all of Leflar's choice-influencing factors. We have never abandoned the significant contacts approach to choice of law issues. In applying the significant contacts approach to choice of law issues we must carefully consider each new fact situation. A court's obligation is to be true to the method rather than to seek merely factual analogies between cases and import wholesale the choice of law analysis contained in those cases. *See Jepson v. Gen. Cas. Co. of Wisconsin*, 513 N.W.2d 467, 470 (Minn.1994).

### III

[¶.22] Applying the facts of this case to our significant contacts test, we first determine all the contacts which might logically influence our decision of which state's law to apply. The significant contacts with North Dakota are: (1) both the injured passenger, Daley, and the driver, Schaffer, were North Dakota residents at the time of the accident; (2) the general liability insurance policy is-

sued by American States to Daley was issued in North Dakota; (3) the automobile insurance policy issued by Nodak to Schaffer was issued in North Dakota; and (4) all of Daley's medical expenses were incurred in North Dakota. The only contact with Minnesota is that the accident occurred there.

[¶ 23] The significance of those contacts are to be measured by examining Leflar's five choice-influencing factors to determine which state has the more significant interest with the issues raised. We consider each factor in turn.

#### A. Predictability of Results.

[¶ 24] "Predictability of results includes the ideal that parties to a consensual transaction should be able to know at the time they enter upon it that it will produce, by way of legal consequences, the same socioeconomic consequences ... regardless of where the litigation occurs[.]" Leflar, *American Conflicts Law*, § 103, at 290. Simply stated, the objective of the predictability factor is to fulfill the parties' justified expectations.

[¶ 25] In *Plante v. Columbia Paints*, 494 N.W.2d 140, 142 (N.D.1992), we stated "'[s]ince there is usually no fixed place for performance of insurance policies, the law of the place of making has more often been taken as determinative of rights under them rather than with other types of contracts.'" (Quoting Leflar, *Supra*, § 153 at 433–34.) The place of making, of course, is not dispositive. "[T]he state whose law is chosen must have a substantial connection with relevant aspects of the insurance transaction." Leflar, *supra*, § 153, at 435.

[¶ 26] In this case, predictability of results favors application of North Dakota law, since both Daley and Schaffer resided in North Dakota, the respective insurance contracts were negotiated in North Dakota, the policies were issued in North Dakota, and the premiums were paid in North Dakota.

#### B. Maintenance of Interstate and International Order

[¶ 27] In discussing the second factor, we are primarily concerned with whether the

application of North Dakota law would manifest disrespect for Minnesota's sovereignty. An aspect of this concern is to maintain a coherent legal system where the courts of different states strive to sustain, rather than subvert, each other's interests in areas where their own interests are less strong. Leflar, *Choice–Influencing Considerations In Conflicts Law*, 41 N.Y.U. L.Rev. at 285–87.

[¶ 28] Leflar also suggests that "[d]eference to sister state law in situations in which the sister state's substantial contacts with a problem give it a real interest in having its law applied, even though the forum state also has an identifiable interest," will further the goal of harmonious relations between the states. Leflar, *American Conflicts Law*, § 104, at 293. As we stated in *Apollo*, "[a] state's application of its law to a transaction whose significant contacts are primarily with another state may induce retaliation in kind, which would not further harmonious relations and commercial intercourse." 382 N.W.2d at 390.

[¶ 29] In this case, the significant contacts are clearly with North Dakota. Application of our law will not cause interstate friction. We find that maintenance of interstate order does not require application of Minnesota law.

### C. Simplification of the Judicial Task

[¶ 30] Simplification of the judicial task is not a relevant factor in this case because the no-fault law of either state could be applied without difficulty.

### D. Advancement of the Forum's Governmental Interests

[¶ 31] In his treatise, Leflar states:

A state's governmental interest in a choice-of-law case is discoverable by (a) identifying the factual contacts which the litigated transaction had with that state,. then (b) determining whether those contacts give rise to real reasons (socioeconomic or political justifications) for applying the state's law to litigated issues in the case.

Leflar, *supra*, § 106, at 295. The notion of "governmental interest," moreover, "must include all the relevant concerns that the particular government, . . . may have in a set of facts or an issue." *Id.*

[¶ 32] In insurance contract cases, we have cause for concern in applying the law of the state that has significantly less contacts than another. In *Apollo*, we stated:

North Dakota can have no substantial governmental interest in regulating the relationship between a Minnesota insurance company and its Minnesota insured or in construing the contractual agreement between them in accordance with North Dakota law when the Minnesota contacts are much more significant than the North Dakota contacts.

382 N.W.2d at 391. Similarly, in *Plante*, we stated:

North Dakota can have no substantial governmental interest in regulating the relationship between a Connecticut insurance company and its Idaho insured, which had its corporate headquarters in Washington, where the . insurance policy at issue was obtained and delivered, and where the premiums were paid.

494 N.W.2d at 143.

[¶ 33] We have the same concerns here with applying Minnesota law. In this case, North Dakota, not Minnesota, has the substantial governmental interest in regulating the relationship between two North Dakota insurance companies and a North Dakota insured. The fortuitous location of the accident in Minnesota does not change that, absent some other contact with the state. Because all contacts other than the location of the accident occurred in North Dakota, we find that North Dakota's governmental interests are advanced by application of North Dakota law.

### E. Application of the Better Rule of Law

[¶ 34] The final consideration is whether North Dakota or Minnesota has, in an objective sense, the better rule of law. By "better," Leflar meant the rule that made "good socio-economic sense for the time when the court speaks." Leflar, *Conflicts Law: More on Choice Influencing Considerations*, 54 Cal. L.Rev. 1584, 1588 (1966). As the Minnesota Supreme Court has stated, however,

"[s]ometimes different laws are neither better nor worse in an objective way, just different." *Jepson,* 513 N.W.2d at 473.

[¶ 35] As we have noted, under North Dakota no-fault law the policy coverage follows the vehicle, N.D.C.C. § 26.1–41–13(2)(a), while under Minnesota's no-fault law the policy coverage follows the person, Minn.Stat. 65B.47, subd. 4(a). Under North Dakota's law the insured is entitled to $30,000 of basic no-fault benefits for medical and wage loss, N.D.C.C. § 26.1–41–01(2), while under Minnesota's law the insured is entitled to $40,000 of basic no-fault benefits ($20,000 for medical and $20,000 for wage loss), Minn. Stat. § 65B.44, subd. 1(a) and (b). North Dakota law provides the no-fault carrier the right to coordinate benefits with the insured's health carrier after $5,000 in payments, N.D.C.C. § 26.1–41–13(3), but Minnesota's law has no such provision.

[¶ 36] At first glance it would appear Minnesota's no-fault law is the better law because it makes "better socio-economic sense." Minnesota's law grants greater benefits and no coordination with the insured's health carrier. In this case, however, the "better law" factor does not influence our significant contacts analysis because the record reflects the insured is covered by a ERISA plan which forecloses coordination of benefits, and the insured's no-fault claim of $12,786.10 does not exhaust the limits under North Dakota law. Furthermore, both states have recognized when a North Dakota insured is injured in a Minnesota accident, no-fault benefits under Minnesota law are available. *See* N.D.C.C. § 26.1–41–15(2)(a) and (b); Minn.Stat. § 65B.46, subd. 2.

[¶ 37] In sum, four of the relevant Leflar factors weigh in favor of applying North Dakota law and the better rule of law factor weighs in favor of neither state.

## IV

[¶ 38] We conclude North Dakota has the more significant contacts and interest with the issues in this case. Under N.D.C.C. § 26.1–41–13(2)(a), therefore, Nodak, as the insurer of the secured motor vehicle involved in the accident, is obligated to pay Daley's

no-fault insurance benefits. The judgment of the district court is reversed.

[¶ 39] VANDE WALLE, C.J., NEUMANN and SANDSTROM, JJ., concur.

[¶ 40] The Honorable CAROL RONNING KAPSNER was not a member of the Court when this case was heard and did not participate in this decision.

