IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-658

No. COA21-506, 21-523

Filed 4 October 2022

Davie County, No. 20CVD256

MICHAEL KEITH SULIER, Plaintiff,

v.

TINA BASTIAN VENESKEY, Defendant.

Appeal by defendant from orders entered 23 February 2021 and 3 May 2021 by Judge Mary F. Covington in District Court, Davie County. Heard in the Court of Appeals 22 March 2022.

*Michael Keith Sulier, pro-se, plaintiff-appellee.*

*Homesley & Wingo Law Group PLLC, by Andrew J. Wingo and Victoria L. Stout, for defendant-appellant.*

STROUD, Chief Judge.

¶ 1 Defendant-maternal Grandmother appeals the trial court's orders determining North Carolina has jurisdiction over the custody of Plaintiff-Father's minor child and awarding him full custody. Because we conclude the trial court had subject-matter jurisdiction under the UCCJEA and its determination Plaintiff-Father is a fit parent who has not abdicated his constitutional rights to the minor child was supported by its findings and the evidence, we affirm.

## I.    Background

This case involves a custody dispute between Plaintiff Michael Keith Sulier ("Father"), and Defendant Tina Bastian Veneskey, maternal grandmother ("Grandmother") of Andrea,[1] who was born in February 2013.[2] Father and Andrea's late mother ("Mother") were never married but were living together when Andrea was born. Father and Mother separated following Andrea's birth, after which the record reflects Father and Mother had a "tumultuous relationship" during which they "broke up a few times and got back together." During this period of about two years, Father cared for the child and "did engage in parenting activities such as feeding, changing and taking care of the child while the mother was at work." Mother and Father then permanently separated in 2014; Mother moved away, took Andrea with her, got married, and changed her last name. Father did not thereafter have contact with Andrea. The trial court found from Father's and his mother's testimony that Father's lack of contact with Andrea after the separation was a result of having been "led to believe by [Mother] and [Grandmother] that they could no longer have communication with the minor child," in part due to a no-contact order, "consistent with the years between 2014-2020." The trial court found after the no-contact order

---

[1] We refer to the minor child by a pseudonym.
[2] The trial court adjudicated Father as the "biological parent of the minor child" in its 23 February 2021 order. Grandmother has not challenged this ruling on appeal.

was lifted in 2016, Father and the paternal grandmother "attempted to locate the minor child through family inquiries and social media," but Mother "had a different last name at that point, and they did not know how to find her." According to Grandmother, Mother moved at least eight times with the child during the five years after Mother and Father separated, throughout North Carolina, Michigan, and Alaska, never staying in one location longer than a year until moving into Mother's final home in North Carolina. Grandmother's pleadings in this action revealed to Father for the first time Andrea's previous whereabouts including her return to North Carolina by August of 2017 and most recently living since October 2018 in a home with Mother, Mother's new husband ("Stepfather"), and another child born to Mother and Stepfather, the minor child's half-sibling, in Mocksville, North Carolina.

¶ 3      Mother passed away on 10 May 2020. At this time, Grandmother lived in Michigan. After Mother's death, on or about 18 May 2020, Grandmother traveled to North Carolina and removed Andrea from North Carolina, bringing her to Michigan to stay with Grandmother and her husband. Grandmother did so without notifying Father and without his consent and has kept Andrea in Michigan since. At the time of Mother's death and at the time this action was filed, Father was residing in Myrtle Beach, South Carolina. Father also has a son with his girlfriend who he has lived with "as a family unit" since his son's birth, and in his briefing on appeal, Father states he "takes care of his [son's] needs [and] he wishes to do the same for his

biological daughter . . . ." Father did not learn of Mother's passing until discovering this through a Facebook posting, at which point he "immediately returned to North Carolina to pick up his daughter." Father contacted the police, family members, and neighbors, but was never informed Grandmother took the child to Michigan.

¶ 4 Grandmother initiated a guardianship proceeding in the Delta County Probate Court in Michigan soon after arriving there with Andrea, on 29 May 2020,[3] and on 30 June 2020 the Michigan court entered an emergency temporary guardianship order. Father then filed his verified Complaint for Child Custody two weeks later, on 15 July 2020, in Davie County District Court. On 30 July 2020, Grandmother filed an action for permanent custody in the Michigan State Court. The Delta Probate Court in Michigan granted temporary guardianship to Grandmother and a telephone conference was then held between the Honorable Mary Covington and the Honorable

---

[3] Grandmother did not include in the Record on Appeal or in her brief to this Court any indication as to the date she filed the guardianship proceeding in Michigan after arriving there with the child on 18 May 2020. We take judicial notice the Michigan Court of Appeals affirmed the Delta County trial court's order declining to exercise child-custody jurisdiction under the UCCJEA on 26 August 2021. *See Veneskey v. Sulier*, No. 355471, 2021 Mich. App. LEXIS 5147 at *1–2, 2021 WL 3821012 at *1 (Mich. Ct. App. Aug. 26, 2021), *review denied*, 967 N.W.2d 71 (Mich. 2021). The Michigan appeal included only the complaint for custody Grandmother later filed in circuit court. *Id.*, 2021 Mich. App. LEXIS 5147 at *2–3, *14–15, 2021 WL 3821012 at *1, *6. According to the Michigan Court of Appeals's opinion, "[Andrea] was removed from North Carolina on May 18, 2020. [Grandmother] filed the[] petition for guardianship on May 29, 2020. [Grandmother] filed the[] circuit court complaint on July 31, 2020." *Id.*, 2021 Mich. App. LEXIS 5147 at *8, 2021 WL 3821012 at *4. We additionally note the trial court's order here indicated Grandmother filed the permanent-custody action in Michigan on 30 July 2020 instead of 31 July 2020.

Perry Lund of the Circuit Court for the County of Delta, Michigan ("UCCJEA conference"). Following that conference, on 29 October 2020, the Michigan Court "entered a summary disposition order under MCR 2.116(C)(4), finding that Michigan is not the home state of the minor child and is an inconvenient forum" and dismissing Grandmother's Michigan custody action.

¶ 5    On 30 September 2020, Grandmother filed a motion to dismiss Father's custody complaint and a Motion for UCCJEA Conference and Answer pursuant to Chapter 50A of the North Carolina General Statutes ("UCCJEA"). Father filed a verified Reply and Response to Motion to Dismiss, noting the previous UCCJEA conference held by Judge Covington and Judge Lund. The next day, on 19 November 2020, Father filed a verified Motion to Allow Supplemental Pleading and verified Supplemental Pleading and Motion in the Cause for an order awarding him immediate and temporary custody based upon the Michigan Court's Order declaring it was not Andrea's home state. On 27 January 2021, Grandmother filed her verified Answer and Counterclaims in North Carolina for "permanent primary custody" of Andrea. The matters were noticed for hearing on 23 February 2021 and came on

that day before the Honorable Mary Covington in Davie County District Court.[4] Judge Lund, in Michigan, also presided virtually at the 23 February 2021 hearing.

¶ 6          By Order on Jurisdiction entered 23 February 2021, Judge Covington concluded North Carolina had subject-matter jurisdiction over Andrea's custody because North Carolina was her "home state" as defined by the UCCJEA; and, as an alternative basis for jurisdiction, a parent or person acting as a parent had significant contacts with North Carolina and North Carolina was a convenient forum for the custody proceeding. The trial court found as fact Grandmother and her husband owned real property located in Davie County, where Grandmother previously resided, and Andrea and Mother were residing in North Carolina continuously for three years prior to Mother's passing. The trial court also found for purposes of the UCCJEA Stepfather "was acting as a parent to [the child] at the time of [Mother's] death . . ." and was living in the North Carolina home with Andrea and her half-sibling. Father filed a verified Motion to Dismiss Grandmother's Second Answer and Counterclaims the same day the trial court entered its Order on Jurisdiction.[5]

---

[4] It appears from the 23 February 2021 hearing transcript there was some question among the attorneys for the Parties regarding the scope of what was noticed for hearing that day, but Grandmother has not raised any argument on appeal regarding the notice of hearing.

[5] On 24 March 2021, Grandmother filed written Notice of Appeal from the trial court's 23 February 2021 Order on Jurisdiction.

¶ 7 By Temporary Custody Order entered 3 May 2021,[6] Judge Covington reaffirmed North Carolina's subject-matter jurisdiction over Andrea's custody and concluded Father did not abdicate his constitutionally protected rights as a parent, was fit and proper to have care, custody, and control, and was therefore entitled to full custody of the child. The trial court dismissed Grandmother's claim for custody and ordered Andrea be immediately returned to Father. On 5 May 2021, Grandmother filed written notice of appeal from the trial court's custody order.

## II. Discussion

¶ 8 Grandmother makes many arguments on appeal challenging the trial court's award of custody to Father and dismissal of her claim for custody. She argues the conference Judges Covington and Lund held prior to the court's Order on Jurisdiction violated the UCCJEA; the trial court erred in concluding North Carolina was Andrea's home state, there also existed significant-connection jurisdiction, and North Carolina was a convenient forum; and the trial court erred in awarding custody to Father because the evidence she presented established as a matter of law that Father abdicated his constitutional rights as a parent. Grandmother also takes exception to

---

[6] It is not clear why the order is entitled "Temporary Custody Order," but the title is not controlling. The order is in substance a final and appealable order granting Father full custody of Andrea and dismissing Grandmother's claim for custody.

the trial court's decision not to admit certain evidence from the child's Michigan therapist.

## A. Standard of Review

We review *de novo* a trial court's conclusion it has subject-matter jurisdiction over a custody dispute pursuant to the UCCJEA. *In re J.H.*, 244 N.C. App. 255, 260, 780 S.E.2d 228, 233 (2015); *see also In re M.R.J.*, 378 N.C. 648, 2021-NCSC-112, ¶ 19 ("[S]ubject-matter jurisdiction is a question of law . . . ." (quotations and citation omitted)).

In custody determinations, "the trial court's findings of fact are conclusive on appeal if there is evidence to support them, even though the evidence might sustain findings to the contrary." *Adams v. Tessener*, 354 N.C. 57, 63, 550 S.E.2d 499, 503 (2001) (quotations and citations omitted). However, "a trial court's determination that a parent's conduct is inconsistent with his or her constitutionally protected status must be supported by clear and convincing evidence." *Id.*; *In re I.K.*, 377 N.C. 417, 2021-NCSC-60, ¶ 20 ("The trial court's legal conclusion that a parent acted inconsistently with his constitutionally protected status as a parent is reviewed de novo to determine whether the findings of fact cumulatively support the conclusion and whether the conclusion is supported by clear and convincing evidence."). "The trial court's findings of fact are conclusive on appeal if unchallenged, or if supported by competent evidence in the record." *In re I.K.*, ¶ 20 (citations omitted).

### B. Procedure for UCCJEA Conference

We first address Grandmother's arguments the trial court violated the UCCJEA in the procedure it followed in communicating with the Michigan Court. Grandmother argues she suffered "significant harm" as a result of the trial court's application of N.C. Gen. Stat. § 50A-110 during its initial phone conference with Judge Lund.[7] That section provides, in part:

> (a) A court of this State may communicate with a court in another state concerning a proceeding arising under [the UCCJEA].
>
> (b) The court may allow the parties to participate in the communication. If the parties are not able to participate in the communication, they must be given the opportunity to present facts and legal arguments before a decision on jurisdiction is made.
>
> . . . .
>
> (d) . . . [A] record must be made of a communication under this section. The parties must be informed promptly of the communication and granted access to the record.

N.C. Gen. Stat. § 50A-110 (2021).

Grandmother here takes issue with the telephone call Judge Lund and Judge Covington had during the Michigan proceeding, prior to the North Carolina hearing

---

[7] This telephone conference originated in the Michigan proceeding; Michigan has the same provision in its UCCJEA statute. *Compare* Mich. Comp. Laws § 722.1110 (2020) *with* N.C. Gen. Stat. § 50A-110 (2021).

regarding jurisdiction. After the telephone conference between Judge Lund and Judge Covington, the Michigan Court dismissed Grandmother's *Michigan* custody action on the ground Michigan was not Andrea's home state or a convenient forum. That call originated with Judge Lund in Michigan based upon the custody proceeding Grandmother filed in Michigan. Grandmother acknowledges there was also a full hearing in the North Carolina action on 23 February 2021 "where the Trial Court of North Carolina, the Circuit Court of Michigan, and the attorneys for both parties from both states were present," and at that hearing both Judges "heard from all attorneys regarding how N.C. Gen. Stat. § 50A-110 was applied . . . and discussed the procedural history of both the Michigan guardianship action and the North Carolina custody action." Grandmother complains the result of the North Carolina hearing "did not change the outcome" of the Judges' earlier phone call in the Michigan proceeding, but that does not change the fact Grandmother had the full UCCJEA hearing in this North Carolina action. The Judges from both States attended a hearing in North Carolina and heard and discussed at length counsels' jurisdictional arguments, and then the trial court entered an Order on Jurisdiction, and a second Temporary Custody Order again finding facts affirming its jurisdiction. Any issue Grandmother takes with the procedure the Michigan Court followed in Grandmother's case there would be for the Michigan Courts to decide, and in fact, the Michigan Court of Appeals affirmed the dismissal of Grandmother's Michigan child-

custody proceeding, concluding North Carolina was the child's home state and Michigan was an inconvenient forum for her custody determination. *See Veneskey, supra*, 2021 Mich. App. LEXIS 5147 at *8-10, 2021 WL 3821012 at *4 ("[A]n individual who removes a minor child from the home state should not obtain a benefit between the removal date and date of a filing of a custody petition in Michigan by claiming that this period destroyed the prior occupancy period and relationship to the home state.").

## C. Jurisdiction Under UCCJEA

¶ 13    Grandmother contends the trial court erred in its ultimate determination North Carolina has subject-matter jurisdiction as Andrea's home state, or in the alternative, significant-connection jurisdiction. Grandmother argues both conclusions were erroneous based on the evidence, but she does not challenge any of the trial court's findings of fact, so we are bound by these findings. *In re K.N.*, 378 N.C. 450, 2021-NCSC-98, ¶ 17 ("Unchallenged findings are deemed to be supported by the evidence and are binding on appeal.").

¶ 14    The trial court made the following findings in support of its determination in its 23 February 2021 Order on Jurisdiction:

> 2.    The Defendants [(Grandmother and her husband)] are the maternal grandparents of the minor child and reside in Michigan, although they own real property located in Davie County, North Carolina, where the minor

child was living at the time of biological [M]other's death.

3. Within moments of the biological [M]other's death, [Grandmother] removed the minor child from the jurisdiction of her home state. The minor child has resided in North Carolina continuously [from] 2017-2020 when her [M]other passed away.

4. There is credible evidence that the minor child lived in multiple places with . . . [Mother]. And although the minor child was born in the State of Michigan, she resided in North Carolina continuously for approximately three years prior to her [M]other's passing in . . . North Carolina.

5. [Grandmother] has previously resided in Davie County, North Carolina.

6. [Mother] was residing in North Carolina six months prior to her death in May 2020. She married and had a child with [Stepfather]. The minor child has a half-sibling that currently lives in North Carolina.

7. [Stepfather] . . . was acting as a parent to . . . [Andrea] at the time of the [M]other's death and when he turned the minor child over to [Grandmother]. He currently still resides in North Carolina.

. . . .

9. Although the child was removed from the state of North Carolina, she and at least one parent or persons acting as a parent, have significant contact with the state of North Carolina.

10. The State of Michigan did assume emergency temporary jurisdiction for the purposes of establishing a temporary guardianship when the child was taken to North Carolina [sic] after the [M]other's death, by [Grandmother]. [Father] did not give consent to the child

being removed from North Carolina.

11.    On October 29, 2020, in the Circuit Court for the County of Delta, in the State of Michigan, the Honorable Perry Lund entered a summary disposition order . . . finding that Michigan is not the home state of [Andrea] and is an inconvenient forum. . . .

12.    As of the date of this hearing, Michigan's only jurisdiction pertained to the temporary guardianship ordered by the Delta County Probate Court in Case No. 20-GM-22549.

. . . .

14.    [Father] filed his action for custody in . . . North Carolina, the child's home state, on July 15, 2020. [Grandmother] filed her custody action in Michigan on July 30, 2020.

. . . .

17.    The Court has determined that North Carolina has jurisdiction over the subject matter in the case and personal jurisdiction over the parties because of [Grandmother] and the minor child's significant contacts within the state of North Carolina.

18.    Furthermore, the court finds that North Carolina is the more convenient forum for the minor child and for [Father] and at least one contestant has significant connections within the state of North Carolina.

. . . .

(Parentheticals added).  The trial court also made the following relevant findings in

its 3 May 2021 custody order:

3.      At the time of [M]other's death, the minor child was residing in Mocksville, NC, in a home owned by [Grandmother], with her [M]other and her new husband of less than a year, [Stepfather] . . . .

. . . .

6.      Neither party in this action currently reside in the State of North Carolina, however, after . . . conducting a jurisdictional hearing with the juvenile Judge in the State of Michigan, it was determined that North Carolina is the home state. That jurisdictional ruling is currently on appeal in Michigan.[8]

7.      The Court finds that North Carolina is the home state of the minor child at the time of the filing of this action. [Andrea] was living at least six months prior to the death of her [M]other and prior to the filing of this action by [Father].

. . . .

9.      [Father] learned of [Mother's death] on the social media page of a family member of the decedent and he immediately returned to North Carolina to pick up [Andrea] . . . .

. . . .

11.     The Court finds that within a few days of [Mother's death], [Grandmother] came to North Carolina from Michigan and removed the child from the jurisdiction of North Carolina and took her back to Michigan. . . . .

---

[8] As noted above, the Michigan Court of Appeals affirmed the Delta County trial court's order on 26 August 2021. *See Veneskey, supra*, 2021 Mich. App. LEXIS 5147 at *1–2, 2021 WL 3821012 at *1.

12.     [Grandmother] and [Stepfather] had an attorney draw up a consent agreement to allow [Grandmother] to take the child back to Michigan without [Father's] consent. . . . .

13.     . . . [Father] had family in the area where [Andrea] was residing [(in North Carolina)] and [his mother,] the paternal grandmother, and [Grandmother] had previous communications by phone to discuss the minor child and exchanged photos . . . .

. . . .

20.     According to the verified pleadings of [Grandmother], [Mother] resided at 6 different addresses although she moved 8 times in 5 years. . . . .

21.     After the no-contact order . . . and the charges were dismissed, [Father and his mother] attempted to locate [Andrea] . . . . [Mother] did not appear in court to testify because she had left the state with [Andrea] and never informed [Father] where she was going.

22.     [Father] . . . . sent [gifts and cards for Andrea] to [Grandmother's] residence in Michigan as [Mother] had a habit of returning to her mother's residence when she needed help from her. . . . .

. . . .

26.     . . . . [Grandmother's] testimony that she moved from her home into a different home right after her daughter's death because the memories of her were too painful, is not credible. It once again appears to the court that it was another way to hide or secret the child from [Father] now that she was appointed guardian in an emergency hearing in Michigan. In fact, it would seem to be more comforting to the grieving child to be around her [M]other's memories and personal belongings, rather than be moved into a place

with no memories.

. . . .

(Parentheticals and footnote added).

Grandmother has not challenged any of these findings as unsupported by the evidence, so these findings are binding upon this Court. *In re K.N.*, ¶ 17; *In re I.K.*, ¶ 20; *see also In re M.R.J.*, ¶ 38 ("The trial court is not required to make specific findings of fact demonstrating its jurisdiction under the UCCJEA, but the record must reflect that the jurisdictional prerequisites in the Act were satisfied when the court exercised jurisdiction." (quotations and citation omitted)). We also note that some of the findings, particularly regarding North Carolina's status as Andrea's home state, are actually conclusions of law, so we will review those "findings" *de novo*. *See Walsh v. Jones*, 263 N.C. App. 582, 589–90, 824 S.E.2d 129, 134 (2019) ("If the trial court labels as a finding of fact what is in substance a conclusion of law, we review that 'finding' *de novo*." (quotations and citation omitted)); *In re Everette*, 133 N.C. App. 84, 85, 514 S.E.2d 523, 525 (1999) ("[A]ny determination requiring the exercise of judgment, or the application of legal principles, is more properly classified a conclusion of law." (quotations and citation omitted)).

"Whenever one of our district courts holds a custody proceeding in which one contestant or the children appear to reside in another state, the court must initially determine whether it has jurisdiction over the action." *In re J.H.*, 244 N.C. App. at

262, 780 S.E.2d at 234–35 (quotations and citation omitted). Subject-matter jurisdiction over child custody actions is governed by N.C. Gen. Stat. § 50A-101 *et seq.*, North Carolina's codification of the UCCJEA. As this Court has previously noted, "Michigan and North Carolina have codified the UCCJEA in virtually identical terms," which, in Article 2, Part 2, establishes several "modes" of jurisdiction. *See In re A.L.L.*, 254 N.C. App. 252, 262, 802 S.E.2d 598, 605–06 (2017) ("The UCCJEA recognizes four modes of subject-matter jurisdiction: (1) initial child-custody jurisdiction, N.C. Gen. Stat. § 50A-201; (2) exclusive, continuing jurisdiction, N.C. Gen. Stat. § 50A-202; (3) jurisdiction to modify determination, N.C. Gen. Stat. § 50A-203; and (4) temporary emergency jurisdiction, N.C. Gen. Stat. § 50A-204.").

¶ 17     The first "mode," North Carolina General Statute § 50A-201, is at issue here. *Id.* That section provides:

> (a)     . . . [A] court of this State has jurisdiction to make an initial child-custody determination only if:
>
> > (1) This State is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding, and the child is absent from this State but a parent or person acting as a parent continues to live in this State;
> >
> > (2) A court of another state does not have jurisdiction under subdivision (1), or a court of the home state of the child has declined to exercise jurisdiction on the ground that this

State is the more appropriate forum under G.S. 50A-207 or G.S. 50A-208, and:

    a. The child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this State other than mere physical presence; and

    b. Substantial evidence is available in this State concerning the child's care, protection, training, and personal relationships;

(3) All courts having jurisdiction under subdivision (1) or (2) have declined to exercise jurisdiction on the ground that a court of this State is the more appropriate forum to determine the custody of the child under G.S. 50A-207 or G.S. 50A-208; or

(4) No court of any other state would have jurisdiction under the criteria specified in subdivision (1), (2), or (3).

(b)     Subsection (a) is the exclusive jurisdictional basis for making a child-custody determination by a court of this State.

(c)     Physical presence of, or personal jurisdiction over, a party or a child is not necessary or sufficient to make a child-custody determination.

N.C. Gen. Stat. § 50A-201 (2021).

¶ 18      This section thus establishes jurisdiction over initial child custody determinations in various scenarios. First, the court must identify the child's "home state" as defined in North Carolina General Statute § 50A-102. Next, the court must

determine whether North Carolina has jurisdiction under any subsection of § 50A-201. If North Carolina is the "home state" and "a parent or person acting as a parent continues to live in this State," jurisdiction falls under subsection (a)(1). Here, the trial court, and the Michigan Court, determined North Carolina is Andrea's home state. *See Veneskey, supra*, 2021 Mich. App. LEXIS 5147 at \*9–10, 2021 WL 3821012 at \*4 (explaining Michigan is not the home state before stating "even if North Carolina does not qualify as the home state" implying North Carolina is the home state). The trial court also found that a person acting as a parent, Stepfather, continues to live in this state.

### 1. *Home State*

¶ 19 We begin the "home state" analysis with the date of commencement of the initial child custody proceeding. In both North Carolina and Michigan, "'[c]ommencement' means the filing of the first pleading in a proceeding." N.C. Gen. Stat. § 50A-102(5) (2021); Mich. Comp. Laws § 722.1102(e) (2021). And in both states, a "child custody proceeding" includes a proceeding for guardianship. N.C. Gen. Stat. § 50A-102(4); Mich. Comp. Laws § 722.1102(d). As noted by the Michigan Court of Appeals,

> "Child-custody proceeding" means a proceeding in which legal custody, physical custody, or parenting time with respect to a child is an issue. *Child-custody proceeding includes a proceeding for . . . guardianship*, paternity, termination of parental rights, and protection from

domestic violence, in which the issue may appear.

*Veneskey*, *supra*, 2021 Mich. App. LEXIS 5147 at *9, 2021 WL 3821012 at *4 (emphasis in original) (quoting Mich. Comp. Laws § 722.1102(d)). The Michigan Court of Appeals continued:

> The May 29, 2020 guardianship petition was filed only several days after [Andrea] left North Carolina. Regardless of the time period during which [Andrea] was removed from North Carolina and [Grandmother's] filings in Michigan to secure guardianship and custody, we conclude that it did not render Michigan as [Andrea's] home state for purposes of plaintiffs' and defendant's claims for custody. Indeed, in the six-month time period preceding [Andrea's] move to Michigan and the commencement of legal proceedings here, [Andrea] resided in North Carolina with her family.

*Id.*, 2021 Mich. App. LEXIS 5147 at *9-10, 2021 WL 3821012 at *4.

Michigan's analysis is consistent with North Carolina law. Moreover, the definition of "home state" in the UCCJEA notes that a "period of temporary absence" of a parent or child is included in the statutory six-month period immediately before commencement of a child custody proceeding. *See* N.C. Gen. Stat. § 50A-102(7) ("A period of temporary absence of any of the mentioned persons is part of the period.").

As noted by the Michigan Court of Appeals, "in the six-month time period preceding [Andrea's] move to Michigan and the commencement of legal proceedings here, [Andrea] resided in North Carolina with her family." *Veneskey*, *supra*, 2021 Mich. App. LEXIS 5147 at *9-10; 2021 WL 3821012 at *4. After her Mother's death,

Andrea remained with "her family," specifically her Stepfather, who was "a person acting as a parent," and her sibling, until Grandmother took Andrea to Michigan on 18 May 2020. On 29 May 2020, Grandmother filed the temporary guardianship proceeding, which was the "commencement of a child custody proceeding," as correctly noted by the Michigan Court of Appeals. *Veneskey*, *supra*, 2021 Mich. App. LEXIS 5147 at \*8, 2021 WL 3821012 at \*4. The trial court found Grandmother took Andrea to Michigan "to hide or secret the child from [Father] . . . ."

¶ 22       Under the UCCJEA, North Carolina was Andrea's home state on the date of the commencement of the proceeding in Michigan, which is the date of commencement of the initial child-custody proceeding. Andrea had lived in North Carolina continuously for more than six months prior to 18 May 2020, when Grandmother took her to Michigan. Thus, Andrea had been in Michigan for only 11 days when a proceeding was filed. We conclude this period of 11 days in Michigan with Grandmother was a temporary absence from North Carolina for purposes of the statutory definition of "home state."

> While the issue of whether an absence from a state amounted to a temporary absence has previously come before this Court, we have decided this issue on a case-by-case basis. Some courts in sister states have adopted certain tests for determining whether an absence from a state was a temporary absence. These tests include (1) looking at the duration of absence, (2) examining whether the parties intended the absence to be permanent or temporary, and (3) adopting a totality of the circumstances

approach to determine whether the absence was merely a temporary absence. We deem the third option to be the most appropriate choice for several reasons. First, it comports with the approach taken by North Carolina courts in determining the issue of whether an absence was temporary on the basis of the facts presented in each case. Second, it incorporates considerations, such as the parties' intent and the length of the absence, that courts of sister states have found important in making this determination. Third, it provides greater flexibility to the court making the determination by allowing for consideration of additional circumstances that may be presented in the multiplicity of factual settings in which child custody jurisdictional issues may arise.

*Chick v. Chick*, 164 N.C. App. 444, 449–50, 596 S.E.2d 303, 308 (2004) (citations omitted).

¶ 23 We therefore consider the "totality of the circumstances to determine whether the absence was merely a temporary absence." *Id.* As part of this analysis, we consider the parties' intent, length of the absence, and the particular factual circumstances of this case. *Id.* The length of absence was extremely short, only 11 days, and the factual circumstances of this case are tragic, as this custody dispute arose upon the death of Andrea's mother and has continued, in two states, because Grandmother sought to "hide or secret the child from [Father]" and establish custody herself in Michigan. Under the totality of the circumstances, her presence in Michigan was a "temporary absence" from North Carolina and North Carolina is Andrea's home state under the UCCJEA. Andrea lived here with her Mother,

Stepfather, and sibling more than six months prior to 18 May 2020. She was moved to Michigan only due to her Mother's death. No doubt Grandmother intended this move to be permanent, not temporary, but Grandmother is not Andrea's parent and did not have custody of Andrea. Thus, Andrea's absence from North Carolina was temporary, only several days, before the commencement of the proceeding. She had resided in North Carolina with Mother and Stepfather for more than six months before the commencement of the proceeding in Michigan. The trial court did not err by concluding North Carolina is Andrea's "home state."

### 2. *Presence of Parent or Person Acting as a Parent*

Under subsection (a)(1), the next issue is whether "a parent or person acting as a parent continues to live in this State." N.C. Gen. Stat. § 50A-201(a)(1). Grandmother contends Stepfather was not a "person acting as a parent" for purposes of § 50A-201(a)(1). She argues

> even though after [Mother's] death [Stepfather] was acting as a parent to the minor child, that status ceased when [Stepfather] signed the agreement to allow Defendant-Appellant to take the minor child to Michigan and Defendant-Appellant did take the minor child to Michigan. Therefore, at the time Plaintiff-Appellee filed his complaint, [Stepfather] was not a person acting as a parent to the minor child because [Stepfather] did not have physical custody of the minor child for six consecutive months immediately before the commencement of the action since Defendant-Appellant had the minor child for approximately two months and prior to that [Mother] had custody of the minor child as her parent. In addition,

> [Stepfather] has not been awarded custody nor is he seeking custody of the minor child as evidenced by his signing of the agreement that gave away any parental rights he possessed at the time to Defendant-Appellant. (04/29/2021 T pp 48, 79).

The trial court found that Andrea's Stepfather was a person "acting as a parent" who continues to live in North Carolina, but this finding is actually a conclusion of law and we review it accordingly. *Walsh*, 263 N.C. App. at 589–90, 824 S.E.2d at 134; *In re Everette*, 133 N.C. App. at 85, 514 S.E.2d at 525. Thus, we must consider whether Stepfather was a "person acting as a parent" under the UCCJEA.

North Carolina General Statute § 50A-102(13) defines a "person acting as a parent" as "a person, other than a parent, who:

> a. Has physical custody of the child or has had physical custody for a period of six consecutive months, including any temporary absence, within one year immediately before the commencement of a child-custody proceeding; and
> b. Has been awarded legal custody by a court or claims a right to legal custody under the law of this State.

N.C. Gen. Stat. § 50A-102(13) (2021).

The Uniform Law Comment for UCCJEA § 50A-102 notes:

> The term "person acting as a parent" has been slightly redefined. It has been broadened from the definition in the UCCJA to include a person who has acted as a parent for a significant period of time prior to the filing of the custody proceeding as well as a person who currently has physical custody of the child. *In addition, a person acting as a parent must either have legal custody or claim a right to legal*

> *custody under the law of this State*. The reference to the law of this State means that a court determines the issue of whether someone is a "person acting as a parent" under its own law.

N.C. Gen. Stat. Ann. § 50A-102 (West 2021) (emphasis added).

¶ 28    We have been unable to find any North Carolina case addressing whether a stepparent who lives with a minor child and her other parent for more than six months prior to the commencement of the child custody proceeding may be considered as a "person acting as a parent" under North Carolina General Statute § 50A-102, particularly where that stepparent is *not* claiming a right to legal custody. Before the trial court, Grandmother argued Stepfather could not be a "person acting as a parent" under the UCCJEA because he was not claiming any right to legal custody; instead, he had executed a "consent agreement to allow [Grandmother] to take the child back to Michigan without [Father's] consent."[9]

¶ 29    Since the UCCJEA is a uniform act, in the absence of any North Carolina cases addressing this issue in detail, we find the analysis by other courts instructive. The North Dakota Supreme Court has summarized treatment of this issue by many states in *Schirado v. Foote*, 785 N.W.2d 235 (N.D. 2010). In *Shirado*, in a custody dispute

---

[9] The terms of this document are not in our record. It is referred to at one point as a "power of attorney" and the trial court referred to it as a "consent agreement," but the import of the document was to grant Grandmother permission to take the child to Michigan and presumably to allow Grandmother to exercise some sort of parental authority over the child.

between the child's parents, the trial court had determined the Fort Berthold Indian Reservation was the child's home state because the child had resided there with his grandparents, as "a person acting as a parent." 785 N.W.2d at 237–38. The North Dakota Supreme Court remanded for additional findings of fact but addressed the analysis of whether the grandparents may be persons "acting as a parent" under the UCCJEA:

> The alternative basis for the district court's dismissal of Schirado's action was that the child lived with Foote's parents. If the home state determination was based in whole or in part on the child living with his grandparents, the grandparents would need to be persons acting as parents to the child. Under our version of the UCCJEA, a "[p]erson acting as a parent" is a nonparent who
>
>> "a. Has physical custody of the child or has had physical custody for a period of six consecutive months, including any temporary absence, within one year immediately before the commencement of a child custody proceeding; and
>> b. Has been awarded legal custody by a court or claims a right to legal custody under the law of this state."
>
> N.D.C.C. § 14–14.1–01(11). The grandparents cared for the child from September 2006 to December 2007, arguably satisfying the first requirement of being "a person acting as a parent" if the jurisdictional decision was not based on J.L.F. living with Foote. N.D.C.C. § 14–14.1–01(6). However, jurisdiction depends on the circumstances that exist at the time the proceeding is commenced. *Id.* The grandparents had not been awarded legal custody by a court before Schirado commenced this action in North Dakota court. Therefore, the dispositive issue for

determining jurisdiction, based on the child living with the grandparents, is whether the grandparents qualified as persons acting as parents by claiming a right to legal custody under the laws of North Dakota. *See* N.D.C.C. § 14–14.1–01(11)(b). We will proceed to discuss the applicable law on this issue because its analysis is likely to arise on remand. *In re Voisine*, 2010 ND 17, ¶ 13, 777 N.W.2d 908 (citing *Dosland v. Netland*, 424 N.W.2d 141, 142 (N.D.1988)).

[¶ 17] This Court has not interpreted what it means to claim a right to legal custody under North Dakota law. A survey of judicial decisions in other states reveals there is no consistent interpretation of the requirement. However, national case law consistently presents three elements considered in determining if a person claims a right to legal custody under the laws of a state: 1) formality, 2) timing and 3) plausibility.

A

[¶ 18] Our sister states require a nonparent's claim of legal custody to conform with differing levels of formality under the UCCJEA. Pennsylvania and Texas require nonparents seeking "person acting as a parent" status to formally apply for legal custody from a court before they are deemed to have claimed a right to legal custody under the UCCJEA. *Wagner v. Wagner*, 887 A.2d 282, 287 (Pa.Super.Ct.2005) (holding parent's mother needed to seek legal custody of the child from a court to claim a right to legal custody under UCCJEA); *In re S.J.A.*, 272 S.W.3d 678, 684 (Tex.App.2008) (holding stepmother needed to seek legal custody of child from a court to claim a right to legal custody under UCCJEA). On the other end of the spectrum, Delaware requires no formal application for legal custody, instead requiring only that the prospective "person acting as a parent" have "the right to claim legal custody" to qualify as a person claiming a right to legal custody of a child. *Adoption House, Inc. v. A.R.*, 820 A.2d 402, 408–09 (Del.Fam.Ct.2003) (holding adoption agency claimed right to legal custody of child by having "the right to claim legal custody").

[¶ 19] In *Hangsleben v. Oliver*, 502 N.W.2d 838, 842–43 (N.D.1993), this Court addressed the term "a person acting as a parent" under the UCCJEA's predecessor, the UCCJA. *See* N.D.C.C. ch. 14–14 (repealed 1999). In *Hangsleben* and under the UCCJA, "[a] 'person acting as a parent' is defined as a 'person, other than a parent, who has physical custody of a child and who has either been awarded custody by a court or claims a right to custody.' " 502 N.W.2d at 842. In *Hangsleben* we concluded "the common-sense definition of a 'person acting as a parent' " included grandparents who "fed, clothed, and cared for" their granddaughter at the request of the child's mother and without a court order. *Id.* at 843. Other jurisdictions have reached similar results. *See In re A.J.C.*, 88 P.3d 599, 606–07 (Colo.2004) (finding adoptive parents to be persons acting as parents under UCCJA where they had "exercised all parental rights and responsibilities" since the child's birth); *Reed v. Reed*, 62 S.W.3d 708, 713 (Mo.Ct.App.2001) (finding maternal grandmother was person acting as parent under the plain meaning of the term in the UCCJA); *In re B.N.W.*, No. M2004–02710–COA–R3–JV, 2005 WL 3487792, **25–26 (Tenn.Ct.App. Dec.20, 2005) (finding paternal grandmother providing care for child was person acting as a parent under UCCJEA); *Ruffier v. Ruffier*, 190 S.W.3d 884, 890 (Tex.App.2006) (finding maternal grandmother caring for child in Belarus was a person acting as a parent under UCCJEA).

[¶ 20] As between the UCCJA and the UCCJEA, the UCCJEA has changed the pertinent portion of the definition of a "person acting as a parent" to mean a person who "[h]as been awarded legal custody by a court or claims a right to legal custody under the law of this state." N.D.C.C. § 14–14.1–01(11)(b). We note the different words used in the definitions in the UCCJEA and the UCCJA. However, we have not been asked by the parties to this appeal to deviate from the level of formality applied in *Hangsleben*. Nor do we perceive a clear majority position among other jurisdictions addressing this point so that we are willing to change course without the benefit of full

briefing and argument by parties with a stake in the outcome of the issue.

[¶ 21] Here, the grandparents did not formally claim a right to legal custody until they petitioned the tribal court to grant them temporary custody of the child. But their extended care and custody of the child appears to satisfy the "common-sense" definition in *Hangsleben* that the grandparents are persons acting as a parent. *See also* N.D.C.C. § 14–10–05 (parent may place child in home of grandparent). Therefore, for purposes of this case, if jurisdiction is based upon the grandparents, the formality requirement can be considered satisfied for purposes of determining whether the Fort Berthold Indian Reservation is the home state.

B

[¶ 22] The next factor is timing of the nonparent's claim. A small number of jurisdictions allow nonparents to assert their claim to legal custody at any point in the pending litigation. *See, e.g., Patrick v. Williams*, 952 So.2d 1131, 1139 n. 9 (Ala.Civ.App.2006) (applying Alabama's modified version of UCCJEA and holding no formal claim to legal custody need be made in cases where grandparents have physical custody of child at time of proceedings); *Adoption House, Inc.*, 820 A.2d at 408–09 (waiving timing element from consideration by allowing nonparents to claim a right to legal custody under UCCJEA by merely having the right to do so). Most jurisdictions addressing this issue require a nonparent's claim of legal custody, whether formal or informal, to be asserted prior to or simultaneous with the initiation of the pending action. *See, e.g., In re Sophia G.L.*, 229 Ill.2d 143, 321 Ill.Dec. 748, 890 N.E.2d 470, 482 (2008) (holding maternal grandparents were persons acting as parents under UCCJEA where grandparents petitioned Indiana court for custody of children before father initiated pending proceeding in Illinois); *Plemmons v. Stiles*, 65 N.C.App. 341, 309 S.E.2d 504, 506 (1983) (holding grandparents were persons acting as parents under UCCJA where grandparents initiated pending proceeding by petitioning for custody of child); *Draper v. Roberts*, 839

P.2d 165, 173–74 (Okla.1992) (holding under UCCJA that "[t]he critical time for testing whether the custodians were 'acting as parents' and 'claim a right to custody' was the point in time when the [pending action] was filed"); *O'Rourke v. Vuturo*, 49 Va.App. 139, 638 S.E.2d 124, 128 (2006) (holding nonbiological father was a person acting as a parent under UCCJEA where he requested custody at outset of pending divorce proceeding); *In re A.C.*, 165 Wash.2d 568, 200 P.3d 689, 692 (2009) (holding foster parents were persons acting as parents under UCCJEA where they petitioned for nonparental custody at outset of pending action).

[¶ 23] Giving priority to a child's home state is the central provision of the UCCJEA, and the UCCJEA is intended to "[a]void jurisdictional competition and conflict with courts of other States in matters of child custody." Uniform Child Custody Jurisdiction and Enforcement Act § 101 cmt.1, 9 U.L.A. 657; *Kelly*, 2009 ND 20, ¶ 21, 759 N.W.2d 721. It has long been held that subject matter jurisdiction is determined at the time a suit is initiated, and to hold otherwise would undermine one of the UCCJEA's central functions by allowing participants to divest a state of jurisdiction by changing the analysis after proceedings have begun. *In re Mannix*, 97 Or.App. 395, 776 P.2d 873, 875 (1989). We therefore conclude that to qualify as a "person acting as a parent" under the UCCJEA, a nonparent's claimed right to legal custody must occur prior to, or simultaneous with, the initial filing related to the instant litigation. To hold otherwise would be contrary to the function of the UCCJEA and contrary to the principles of "certainty, predictability and uniformity of result." *Daley v. American States Preferred Ins. Co.*, 1998 ND 225, ¶ 14 n. 4, 587 N.W.2d 159 (enumerating goals in choice of law analysis).

*Schirado*, 785 N.W.2d at 240–43 (alterations in original).

Thus, the North Dakota Supreme Court determined the factors normally

considered in the analysis of whether a person is "a person acting as a parent" under the UCCJEA are the 1) formality, 2) timing and 3) plausibility of the person's claimed right to legal custody of the child. *Id.* at 241. The relevant time is immediately prior to or simultaneously with the commencement of the child custody proceeding. *Id.* at 243. We hold this analysis is consistent with the "function of the UCCJEA" and "principles of 'certainty, predictability and uniformity of result.'" *Id.* (quoting *Daley v. American States Preferred Ins. Co.*, 587 N.W.2d 159, 162 n.4 (N.D. 1998)).

¶ 31    Here, these factors make our analysis quite simple. We need not analyze the formality or plausibility of any claim to custody by Stepfather under North Carolina law, because he made no such claim. At the time of commencement of the proceeding, Stepfather was not making any claim to custody. To the contrary, he had executed a document purporting to give Grandmother permission to take the child to Michigan. We need not consider whether Stepfather would have had any right to a claim for custody under North Carolina law because he clearly did not make such a claim but instead declared his opposite intention. Under the UCCJEA, Stepfather was not a "person acting as a parent," and the trial court's conclusion to this effect was not supported by its findings of fact.

¶ 32    Thus, North Carolina is Andrea's "home state," but no parent or person acting as a parent remains in North Carolina. Subject matter jurisdiction does not fall under subsection (a)(1). We must proceed to consider subsection (a)(2).

### *3. Significant Connection Jurisdiction*

¶ 33    The trial court concluded North Carolina would have significant connection jurisdiction, but part of this determination was based upon its conclusion that Stepfather was a "person acting as a parent" and we have already addressed this issue. There was no "person acting as a parent" in this case, and Father is the only parent.

¶ 34    North Carolina General Statute § 50A-201(a)(2) provides this State may have jurisdiction if:

> (2)    A court of another state does not have jurisdiction under subdivision (1), or a court of the home state of the child has declined to exercise jurisdiction on the ground that this State is the more appropriate forum under G.S. 50A-207 or G.S. 50A-208, and:
>
> a.    The child *and* the child's parents, or the child *and at least one parent or a person acting as a parent*, have a significant connection with this State other than mere physical presence; *and*
> b.    Substantial evidence is available in this State concerning the child's care, protection, training, and personal relationships;

N.C. Gen. Stat. § 50A-201(a)(2) (emphasis added).

¶ 35    As we have already addressed, Father lives in South Carolina. There is no parent or "person acting as a parent" who lives in North Carolina or who has significant connections with North Carolina. Stepfather was not a "person acting as a parent," and based upon the trial court's findings of fact, Grandmother was not a

"person acting as a parent" either. At the time of the commencement of the proceeding, she did not have "physical custody of the child" and had not "had physical custody for a period of six consecutive months, including any temporary absence, within one year immediately before the commencement of a child custody proceeding." N.C. Gen. Stat. § 50A-102(13). Based on the trial court's findings, the *child* had "significant connection" to North Carolina, but subsection (2) requires that *both* the child and "at least one parent or a person acting as a parent, have a significant connection with this State other than mere physical presence." N.C. Gen. Stat. § 50A-201(a)(2)(a). Here, there is no parent in North Carolina or with significant connections to North Carolina. Thus, jurisdiction cannot fall under subsection (a)(2), despite the trial court's findings regarding "substantial evidence . . . available in this State concerning the child's care, protection, training, and personal relationships." *Id.*, § 50A-201(a)(2)(b). We must proceed to subsection (a)(3).

### 4. *More Appropriate Forum Jurisdiction*

¶ 36        North Carolina General Statute § 50A-201(a)(3) allows jurisdiction where "[a]ll courts having jurisdiction under subdivision (1) or (2) have declined to exercise jurisdiction on the ground that a court of this State is the more appropriate forum to determine the custody of the child under G.S. 50A-207 or G.S. 50A-208."

¶ 37        Here, Grandmother claimed Michigan should have subject matter jurisdiction, but Michigan determined it was not the child's home state and that North Carolina

is the more appropriate forum to determine custody. *See Veneskey, supra*, 2021 Mich. App. LEXIS 5147 at *9–13, 2021 WL 3821012 at *4–6 (Michigan court finding it would be an inconvenient forum and then determining North Carolina would have jurisdiction). There is no state other than North Carolina or Michigan which might have initial child custody jurisdiction under the UCCJEA. Although Father lives in South Carolina, Andrea has never lived there. But this case does not fall clearly under subsection (a)(3) because no other state "*having jurisdiction under subdivision (1) or (2) . . .* declined to exercise jurisdiction on the ground that a court of this State [North Carolina] is the more appropriate forum to determine the custody of the child under G.S. 50A-207 or G.S. 50A-208." N.C. Gen. Stat. § 50A-201(a)(3) (emphasis added. Michigan determined it did not have jurisdiction under subdivisions (1) or (2), although it did determine North Carolina would be the more appropriate forum. *Veneskey, supra*, 2021 Mich. App. LEXIS 5147 at *9–13, 2021 WL 3821012 at *4–6. We must proceed to subdivision (a)(4).

### 5. *Jurisdiction by Necessity*

¶ 38 North Carolina General Statute § 50A-201(a)(4) provides that a court of this State has jurisdiction to make an initial child-custody determination only if "[n]o court of any other state would have jurisdiction under the criteria specified in subdivision (1), (2), or (3)." N.C. Gen. Stat. § 50A-201(a)(4).

¶ 39 Due to the unusual circumstances of this case, North Carolina has jurisdiction

by necessity under § 50A-201(a)(4). As we have already discussed, no other state would have jurisdiction to make an initial child custody determination under subdivisions (1), (2), or (3). North Carolina is the child's home state, and as demonstrated by the trial court's unchallenged findings of fact, the child has significant connections to North Carolina. She lived here prior to her Mother's death, and she has a sibling in North Carolina with her Stepfather. As noted by the trial court's findings, there is substantial evidence regarding the child's welfare in North Carolina. The only other state which could have possibly had jurisdiction under the UCCJEA, Michigan, has determined it is not the child's home state and that North Carolina is the more appropriate forum. *Veneskey, supra*, 2021 Mich. App. LEXIS 5147 at *9–13, 2021 WL 3821012 at *4–6. Therefore, although the trial court relied upon the wrong subdivision of 50A-201(a) to conclude it had jurisdiction, on *de novo* review, we conclude North Carolina does have jurisdiction to make an initial child custody determination under subdivision (a)(4).

## D. Custody Determination

Finally, Grandmother argues the trial court erred in dismissing her claim for custody and in awarding Father full custody because it concluded Father was a fit parent who has not abdicated his constitutionally protected rights as a parent to Andrea.

¶ 41        Our Supreme Court has long established that "natural parents have a constitutionally protected interest in the companionship, custody, care, and control of their [biological] children." *Price v. Howard*, 346 N.C. 68, 72, 484 S.E.2d 528, 530 (1997); *David N. v. Jason N.*, 359 N.C. 303, 305, 608 S.E.2d 751, 752–53 (2005) (reaffirming "the paramount right of parents to the custody, care, and control of their children"). "[T]he Due Process Clause would be offended 'if a [court] were to attempt to force the breakup of a natural family . . . without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest.'" *Adams*, 354 N.C. at 61, 550 S.E.2d at 502 (quoting *Price*, 346 N.C. at 78, 484 S.E.2d at 534) (alterations from original omitted and own alterations added).  As our Supreme Court has explained, a fit and natural parent "is presumed to act in the child's best interest and . . . there is normally no reason for the state to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's [child]." *Id.*, 354 N.C. at 60, 550 S.E.2d at 501 (quotations and alterations from original omitted) (citing *Troxel v. Granville*, 530 U.S. 57, 68–69, 147 L.E.2d 49, 58 (2000)).

¶ 42        "[W]hile a fit and suitable parent is entitled to the custody of his child, it is equally true that where fitness and suitability are absent he loses this right." *David N.*, 359 N.C. at 305, 608 S.E.2d at 753 (quotations and citations omitted); *Adams*, 354 N.C. at 61, 550 S.E.2d at 502 ("[A] parent's right to custody is not absolute.").  Indeed,

the protection afforded to biological parents comes "with similar recognition that some facts and circumstances, typically those created by the parent, may warrant abrogation of those interests." *Price*, 346 N.C. at 75, 484 S.E.2d at 532; *id.*, 346 N.C. at 79, 484 S.E.2d at 534 ("[A] parent may no longer enjoy a paramount status if his or her conduct is inconsistent with this presumption or if he or she fails to shoulder the responsibilities that are attendant to rearing a child."). "Unfitness, neglect, and abandonment clearly constitute conduct inconsistent with the protected status parents may enjoy." *Id.*, 346 N.C. at 79, 484 S.E.2d at 534. This is in addition to "[o]ther types of conduct, which must be viewed on a case-by-case basis . . . ." *Id.*, 346 N.C. at 79, 484 S.E.2d at 534–35. Ultimately, the test our Supreme Court lays out is that "a natural parent may lose his constitutionally protected right to the control of his children in one of two ways: (1) by a finding of unfitness of the natural parent, or (2) where the natural parent's conduct is inconsistent with his or her constitutionally protected status." *David N.*, 359 N.C. at 307, 608 S.E.2d at 753; *see also Price*, 346 N.C. at 73, 484 S.E.2d at 531 (stating the interest of natural parents "must prevail against a third party unless the court finds that the parents are unfit or have neglected the welfare of their children"). A finding of either must be supported by clear and convincing evidence. *David N.*, 359 N.C. at 307, 608 S.E.2d at 753.

¶ 43        Here, the trial court determined Father was both a fit and proper parent and he had not abdicated his constitutionally protected right to parent Andrea.

Grandmother argues this determination is erroneous because she presented clear and convincing evidence showing Father "did not partake in much of the child rearing including taking the child to her many doctors' appointments, only paid child support twice in 2015 in the over five years that he did not have custody of the child, . . . did not visit with the minor child upon the end of [his and Mother's] relationship in approximately 2015[,]" or thereafter attempt to seek custody; and that he drinks alcohol. According to Grandmother, this clear and convincing evidence mandated the trial court conclude Father had abdicated his right to Andrea's custody and award custody to Grandmother.

¶ 44    We note a trial court is not bound to render any determination propounded by a party simply because there is sufficient evidence before it which could tend to support that determination. *Cf. Adams*, 354 N.C. at 63, 550 S.E.2d at 503 (explaining a "trial court's findings of fact are conclusive on appeal if there is evidence to support them, *even though the evidence might sustain findings to the contrary*" (emphasis added; quotations and citations omitted)). Again, Grandmother challenges the trial court's custody determination but does not argue there was insufficient evidence to support the findings of fact upon which it relied in reaching its conclusion. Our inquiry thus is to "determine whether the trial court's findings support its legal conclusion that" Father did not abdicate his constitutional rights by acting inconsistent therewith. *Id.*, 354 N.C. at 65, 550 S.E.2d at 504.

¶ 45          The following findings of fact relevant to the trial court's custody determination are unchallenged as supported by the evidence and are thus binding on us:

> 9.    [Father] learned of the death of [Mother] on the social media page of a family member of [Mother] and he immediately returned to North Carolina to pick up his daughter. He made inquiry with the police department as well as family members and neighbors as to her whereabouts.
>
> . . . .
>
> 11.    The Court finds that within a few days of the unexpected death of [Mother], [Grandmother] came to North Carolina from Michigan and removed the child from the jurisdiction of North Carolina and took her back to Michigan. [Father] was never informed. [Grandmother] testified that the thought to notify [Father] never crossed her mind.
>
> 12.    [Grandmother] and the [Stepfather] had an attorney draw up a consent agreement to allow [Grandmother] to take the child back to Michigan without [Father's] consent. . . . The court finds that [Father] did not cede any portion of his custody rights to [Stepfather] or [Grandmother] voluntarily as he was never notified of the marriage to [Stepfather] or the consent agreement removing his child from the jurisdiction of the court.
>
> 13.    [Grandmother] made zero efforts to locate [Father] before secreting the child away. [Father] had family in the area where the child was residing and the paternal grandmother [and Grandmother] had previous communications by phone to discuss the minor child and exchanged photos of the minor child. At no time was [Father] or the paternal grandmother given the

opportunity to visit with the minor child while in the care of [Grandmother].

14.   It is uncontroverted that [Father] and [Mother] had a tumultuous relationship. They broke up a few times and got back together. It is common for couples who have a traumatic breakup to leave custody arrangements of the child (born of their relationship) open and incomplete as they navigate the issues. The court finds that the gap of time that [Father] went without communicating with his child was not tantamount to abandonment or neglect.

15.   [Father] is a person of limited means financially and educationally. It appears from his testimony and from the testimony of the paternal grandmother, they were both led to believe by [Mother] and [Grandmother] that they could no longer have communication with the minor child. This is consistent with the years between 2014-2020.

16.   There is credible evidence by [Father] and the paternal grandmother that [Father] did engage in parenting activities such as feeding, changing and taking care of the child while [Mother] was at work. The parents of this minor child were very young, and both acted as such on multiple occasions, before and after the birth of the child. This does not make [Father] an unfit parent. He was not given the opportunity to parent after [Mother] and child moved away and [Mother] changed her name, through marriage.

17.   During one of their breakups, [Father] and [M]other attempted to establish a custody agreement including but not limited to child support. [Father] did actually make two child support payments before the parties reconciled, and the agreement became moot. There was never a child support order entered by any court between the parties subsequently. . . . .

18.   There is credible evidence that after the final

breakup of [Father] and [Mother], that [Father] was informed he was not allowed to have any contact with the minor child due to a pending charge for breaking and entering which was later dismissed.

19.     [Father] remained compliant with the court ordered no-contact order and believed that any contact with [Mother] or the minor child would result in his bond being revoked. This order was in effect between 2015-2016. During that time period, [Father] did not attempt to contact [Mother] or the child. His belief that he couldn't have contact was reasonable based on the facts and circumstances at that time.

. . . .

21.     After the no-contact order (pursuant to the domestic charges against [Father]) and the charges were dismissed, [Father] and the paternal grandmother attempted to locate the minor child through family inquiries and social media. [Mother] had a different last name at that point, and they did not know how to find her. [Mother] did not appear in court to testify because she had left the state with the minor child and never informed [Father] where she was going.

22.     [Father] and paternal grandmother did purchase and mail gifts, cards and letters for the minor child in an effort to reestablish contact with her. They were sent to [Grandmother's] residence in Michigan as [Mother] had a habit of returning to her mother's residence when she needed help from her. Many, if not all, of the cards and gifts were returned to [Father] by [Grandmother], or "someone" in the State of Michigan. The testimony of [Grandmother] that she never saw any of the gifts, cards and letters which were addressed to the child to her address is not credible.

23.     The minor child appeared to be bonded with the paternal grandmother as well, prior to the child being

moved around by [Mother] and [Grandmother]. In fact, [Father] (with the help of the paternal grandmother) and child's [M]other were able to make amenable arrangements for visitations each time the couple broke up.

24.     [Grandmother] has not allowed [Father] to have any contact with the minor child since the death of her [M]other, even though [Grandmother] has been aware that he has attempted to locate the child and have a relationship with her.

25.     The minor child has never been informed that [Stepfather] is not her biological father or that her real [F]ather even exists. It appears that the intent of [Grandmother] was to thwart any potential relationship that the minor child could have with [Father].

26.     The Court finds that [Grandmother] has intentionally tried to hide the minor child from [Father]. [Grandmother's] testimony that she moved from her home into a different home right after her daughter's death because the memories of her were too painful, is not credible. It once again appears to the court that it was another way to hide or secret the child from [Father] now that she was appointed guardian in an emergency hearing in Michigan. In fact, it would seem to be more comforting to the grieving child to be around her [M]other's memories and personal belongings, rather than be moved into a place with no memories.

27.     There is no credible evidence that [Father] voluntarily permitted the minor child to remain in the custody of [Grandmother] or agreed to allow [Grandmother] to act in loco parentis to the child. It would appear from the evidence that long before the [M]other passed away, [Mother] was moving around excessively in an effort to alienate the child from her [F]ather and [Grandmother] was funding those moves. . . .

28.     There is credible evidence to indicate that there were gaps in time when [Father] did not pursue the minor child's whereabouts, however, the court does not find that brief gaps of time are tantamount to abandonment of the minor child. [Mother] moved multiple places and got married with a name change. She never informed [Father] of any of those moves or changes.

29.     . . . [Mother] intentionally left the child with [Grandmother] for months at a time after [Father] and [M]other finally split. [Father] was never given the opportunity to agree or disagree with said placement.

. . . .

32.     The minor child has a sibling who is in the custody of [Father] whom she has never met, and a sibling who resides with her [Stepfather] . . . .

¶ 46     We note that "[i]n considering whether disruption of custody over an extended period of time may result in a possible displacement of a parent's constitutionally protected interests," our Supreme Court has "recognized the danger of a fact situation . . . in which the custodian[] obtained custody unlawfully[:]"

> the resolution of cases must not provide incentives for those likely to take the law into their own hands. Thus, those who obtain custody of children unlawfully, particularly by kidnapping, violence, or flight from the jurisdiction of the courts, must be deterred. Society may not reward, except at its peril, the lawless because the passage of time has made correction inexpedient.

*Price*, 346 N.C. at 81–82, 484 S.E.2d at 536 (quotations, citations, and alterations from original omitted; own alteration added).

¶ 47        The trial court's findings of fact fully support its conclusions that Father did not act inconsistently with his constitutionally protected status as a natural parent and was fit to have custody. *Cf. Adams*, 354 N.C. at 66, 550 S.E.2d at 505 ("The trial court's findings of fact are sufficient, when viewed cumulatively, to support its conclusion that [the natural parent's] conduct was inconsistent with his protected interest in the child."). Grandmother's argument is based on her contentions regarding the evidence she presented which she believes would support different findings of fact and also regarding the best interests of the child. However, the trial court is the sole judge of credibility of the witnesses. "[T]he trial court sees the parties in person and listens to all the witnesses. This allows the trial court to detect tenors, tones and flavors that are lost in the bare printed record read months later by appellate judges." *Id.*, 354 N.C. at 63, 550 S.E.2d at 503 (quotations and citations omitted). And where the natural parent is not unfit and has not acted inconsistently with his constitutionally protected rights as a parent, even if Grandmother may have a greater ability to provide for the child, the government may not, "over the objections of the parent," remove a child from her natural parent "solely to obtain a better result for the child."[10] *Id.*, 354 N.C. at 61–62, 550 S.E.2d at 502–503 (quotations and citation

---

[10] The evidence from the child's therapist appointments in Michigan following her Mother's death, which Grandmother sought to introduce and argues was erroneously excluded, was not proffered for the record. In any event, evidence from Andrea's therapy in Michigan would

omitted). We conclude the evidence and the trial court's findings, unchallenged and binding on appeal, support the trial court's determination that Father is fit and proper and has not abdicated his constitutionally protected right to parent Andrea. *Cf. In re Gibbons*, 247 N.C. 273, 281, 101 S.E.2d 16, 22 (1957) ("Since the death of his wife there is little evidence that he has had any great yearning to have his child with him . . . . Instead he surrendered this high privilege to the grandmother . . . ." (quotations and citation omitted)). Accordingly, the trial court did not err in its dismissal of Grandmother's claim or in its award of full custody to Father.

## III. Conclusion

Although the trial court relied upon the wrong subsection of North Carolina General Statute § 50A-201(a) to conclude North Carolina has jurisdiction under the UCCJEA, the trial court's findings of fact support a conclusion that North Carolina has subject matter jurisdiction over custody under the UCCJEA and Father is a fit and proper parent who has not abdicated his constitutional rights as a parent. We therefore affirm the trial court's orders as to subject matter jurisdiction and custody. Grandmother's motion for sanctions under the appellate rules is denied.

AFFIRMED.

---

not address Father's circumstances or fitness as a parent under the circumstances of this case but could relate only to the best interests of the child—an issue neither the trial court nor we can address.

Judges HAMPSON and JACKSON concur.